EXHIBIT "C"

## **PRECIS OF TORTIOUS INTERFERENCE BY THE DEFENDANT**

November 1996:
Plaintiff invents Porta-Rinx.

Two weeks later:
Plaintiff meets Defendant at the Copy World store in Barre, VT. Defendant is studying business at Norwich University, Plaintiff and Defendant become friends. Defendant offers to do marketing of Porta-Rinx for Plaintiff. Defendant creates brochure, which employs on its cover the phrase "world famous in hockey." This prompts Plaintiff to remind Defendant not to exaggerate in his marketing claims for Porta-Rinx, especially given the fact that Porta-Rinx is a nascent product.
Both parties enter into a non-disclosure agreement, with Defendant d/b/a Good Associates, Inc.

Circa February 1997:
Defendant and Plaintiff for the time being conclude their business arrangement and go their separate ways.

January 2002:
A chance encounter in Montpelier between Defendant and Plaintiff leads to Defendant stating that he is looking for work. Plaintiff offers Defendant $500 per week to help Plaintiff build, deliver and install rinks. This arrangement continues through February 2002, at which time Defendant decides to move to California. (En route to California, Defendant calls Plaintiff to thank Plaintiff for some of the people skills that Plaintiff has imparted to Defendant in the course of their business relationship.)

October 2003:
Plaintiff and Defendant enter into a written agreement for Defendant to do sales for Porta-Rinx at a commission rate of 20%. Within a month, Defendant creates his own Web site, filching photos from Plaintiff's Web site and changing any reference to "Porta-Rinx" to "Our Rink" or "Our Rinks."
Plaintiff gives Defendant an ultimatum, both in writing and verbally: Market Porta-Rinx responsibly and properly or not at all. Defendant replies to this

ultimatum in a one-word E-mail: "Yes."
Defendant then endeavors to elicit his friend and Norwich classmate, William E. McIntosh IV, to create a knockoff of the Porta-Rinx product. Once McIntosh fully realizes how daunting a prospect this will be, he switches tactics and attempts to negotiate with Plaintiff a deal in which McIntosh would act as a sort of middleman aiding Defendant in the sales and marketing of Porta-Rinx for Plaintiff. Plaintiff replies that he is only interested in the honest and ethical marketing of his products.

January 2004:
Defendant calls Plaintiff in tears because he has checks for product that he needs to deliver. Defendant makes seven or eight more rink sales; Plaintiff pays him the commission on those sales, vowing that their business relationship will cease at the end of the winter sales season if Defendant cannot live up to the agreement with Plaintiff that he will only represent Porta-Rinx in the proper manner upon which Plaintiff insists.

February 2004:
Plaintiff informs Defendant via E-mail, "If you are not going to market my products properly, then I don't want you marketing my products ... "
Defendant begins his cybersquatting on various domain names, including but not limited to three variations on the Porta-Rinx name (e.g.. www.Portarinx.com, www.Portarinks.com and www.Porta-Rinx.com) as well as www.VTBambini.com, www.Icemower.com and one utilizing Plaintiff's given name and middle name, www.DamianJ.com.

December 2005-January 2006
Barre-Montpelier Times Argus newspaper heralds Plaintiff's December 2005 first audition for the "American Inventor" television show then airing on ABC, and notes that Plaintiff received a "call-back" to appear, all expenses paid, in Los Angeles, for a second round of auditions.
Plaintiff ships ahead the new product that he intends to promote on the broadcast, a Christmas tree stand called the "Safe Tree Hang."
He flies to Los Angeles. Upon arrival, the show's producers pull Plaintiff aside and ask, "Who is Michael E. Nelson?" They say that someone by that name keeps calling with threats to sue them if Plaintiff appears on the show. Plaintiff gets to appear before the judges for the show, who give Plaintiff short shrift and summarily reject his possible appearance on the show.

May 2005:
Plaintiff commences the action, *Renzello v. Nelson*, in U.S. District Court, District of Vermont.

---

May 16, 2007:
The District Court, The Hon. J. Garvan Murtha presiding, orders that Defendant cease and desist his cybersquatting on the domain names. The Court also orders Defendant "not to interfere with ... (Plaintiff's) business interests for the purpose or intent of causing financial or other harm" as well as "not intentionally contact ... (Plaintiff) in person or within 100 yards, by phone, by fax, email or any other form of contact."

---

Circa 2007-to present:
--- Numerous newspaper reporters in various locales throughout New England and beyond write articles about the new Porta-Rinx rink coming to their respective towns. One of these articles, in a Connecticut newspaper, prompted the Defendant to call both the reporter and the town recreation director with threats to sue them on vague or unspecified grounds.
--- Toby Talbot of The Associated Press writes a wire-service story about the Plaintiff's new Bambini product. Defendant calls Talbot with the usual vague, unspecified threats of suit. When Plaintiff tried to reach the AP's Talbot to discuss possible news articles on subsequent inventions of the Plaintiff's, Talbot did not return Plaintiff's calls.

October 2, 2007:
In the online comments section of a story that Popular Science magazine had done regarding the Plaintiff's new Bambini product ("A Homemade Zamboni: In his quest to create the perfect outdoor rink, a hockey fan linked, wired and welded together an ice-moving, snow-throwing Frankenstein," March 2007), Defendant writes --- using the pseudonym "David Black" --- "Don't get taken by this Renzello character," among other scurrilous and defamatory comments in the Defendant's screed.

Circa late 2007-early 2008:
--- Harry Monti, then mayor of Barre City, calls to say that Defendant has repeatedly called Monti to leave threatening messages; This puts a chill in the relationship between Plaintiff and Mayor Monti.
--- Plaintiff buys a motorcycle from Wilkins Harley Davidson, which habitually puts on its Web site the photographs of its recent customers. Defendant calls Wilkins and threatens co-owner John Lyon with some sort

of vague lawsuit pertaining to Plaintiff.
--- Defendant repeatedly calls John Fiore, Plaintiff's stepbrother, with similar vague threats of legal action pertaining to Plaintiff. This also puts a chill in the relationship between Plaintiff and his stepbrother.
--- Plaintiff had a business partnership with Donald Routhier, a Barre entrepreneur, over another of the Plaintiff's new inventions, a hardware organizer/carrier called "My Work Buddy" (the 2002 recipient of the "retailers' choice award" at the National Hardware Show in Chicago). Defendant repeatedly calls Routhier with vague threats of legal action pertaining to Plaintiff. This puts a chill in the relationship between Plaintiff and Routhier.

Early 2008:
Plaintiff has spent two years cultivating a business relationship with the Boston Bruins Foundation, which is a 501(c)(3) non-profit affiliated with the National Hockey League team. This included an investment by Plaintiff exceeding $45,000 --- never recouped --- in products donated as giveaways during Bruins games and events.
Plaintiff and the Foundation are negotiating a potential deal to market the Porta-Rinx product line during Bruins games (through such means as a kiosk audiovisual display in the Bruins' arena lobby as well as ads on the giant Jumbotron display --- and announcements --- during games). This agreement held promise for Plaintiff to realize significant revenues, easily into the seven figures, especially once Plaintiff could build on his inroads with the Bruins to sell the Porta-Rinx product line in similar "private-label" arrangements with the various other NHL teams.
In early 2008, Boston Bruins Foundation executive Paul Stewart calls to ask Plaintiff, "Who is Michael E. Nelson?" Stewart says that Nelson keeps calling Bruins owner Charles Jacobs and threatening to sue the Bruins and the Foundation. The deal fizzles within a few weeks.

Circa 2010:
Officials from the town of Monroe, N.Y., call Plaintiff to obtain information regarding the possible acquisition of a Porta-Rinx skating rink. A town official goes online to conduct research about the Plaintiff and the Porta-Rinx line. The Monroe town recreation director calls Plaintiff to question him about Defendant's numerous derogatory online comments besmirching both Plaintiff and the Porta-Rinx products. Only by having a lengthy conversation with these officials did Plaintiff rescue the sale from likely rescission.